UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN V. COSTA, ) | | |
|         Plaintiff ) | | |
| ) | | |
| VS ) | CIVIL ACTION NO. 04-11732 MBB | |
| ) | | |
| SHANE M. REUL, ) | | |
|         Defendant ) | | |

**PLAINTIFF JOHN COSTA'S OPPOSITION TO
DEFENDANT SHANE REUL'S MOTION FOR SUMMARY JUDGMENT**

Now Comes the Plaintiff, John V. Costa, in the above-captioned proceeding, and respectfully requests that this Honorable Court deny Defendant, Shane M. Reul's Motion for Summary Judgment. In support of this motion, Plaintiff submits the following Memorandum of Law.

**I.  FACTS IN DISPUTE**

    a.  The Service of Restraining Orders on the Monteiro's

1. On July 16, 2002, while serving a G.L. c. 209A restraining order on the Arnaldo and Kendra Monteiro, Plaintiff heard Defendant remark to Mrs. Monteiro, "Oh no, Mrs. Monteiro, if I had known this was you I wouldn't be here." (See Plaintiff's Response to Interrogatory No. 7; pp. 51-52, of J. Costa dep.; and pp. 67-68 of M. Costa dep. of attached Exhibit A).[1]

2. Plaintiff also heard Defendant remark that he did not believe the restraining order was valid, and that he could go to the court, talk to the judge who he

---

[1] Page references to deposition transcripts will be indicated as "p. [ ] of [ ] dep." Allusions to deposition of John Costa will be made as "J. Costa dep."; Shane Reul's deposition will be reflected as "S. Reul dep.;" and Mary Beth Costa's deposition will be referred to as "M. Costa dep."

        knew, and have the order "thrown out." (See pp. 53-55 of J. Costa dep. of Exhibit A).

3. Mr. Monteiro has a criminal record. Mr. and Mrs. Monteiro possessed firearms at the Plaintiff's house. They had once surrendered their weapons to the Somerset police on prior altercation with their landlord. (See pp. 29-32, p. 94 of J. Costa dep.; Somerset police report, attached as Exhibit B).

4. Defendant also stated, "Just go down to the court and get a restraining order against him. If he puts one foot on the steps, call us and he'll be out of here." "He'll be put in jail and if he gets out he won't be able to come back." "All it takes is one step and you'll be back in your house." (See Plaintiff's Response to Interrogatory No. 7; pp. 53-55 of J. Costa dep. of Exhibit A).

5. When Defendant descended the stairs, Plaintiff confronted him asking, "Are you going to arrest me?" Defendant responded by saying, "Get in the fucking apartment and close the door before I arrest you," and, "Close the door, you are not supposed to be listening to us." (See pp. 55-60 of J. Costa dep.; and pp. 69-70 of M. Costa dep., attached as Exhibit C).

6. Given the intensity of Defendant's threats and gestures, Plaintiff was afraid he was going to be arrested. He told his wife to call "911" for assistance. (See pp. 56-57 of J. Costa dep.; pp. 68, 70, 73 of M. Costa dep., attached as Exhibit D).

7. Plaintiff observed Defendant and Mrs. Monteiro talking in front of his house for some time. He saw that Ms. Monteiro was smiling and heard Defendant telling her, "Don't worry Mrs. Monteiro, the restraining order won't stand" and that

they would "get this all squared away – you'll be back home in a half an hour." (See pp. 53-55, 61 of J. Costa dep. of Exhibit A).

    b. The Courthouse

8. Following that conversation Plaintiff saw Defendant leave, with Ms. Monteiro following him in her car. (See Plaintiff's Response to Interrogatory No. 7; p. 62 of J. Costa dep., of Exhibit E).

9. Plaintiff then proceeded to the courthouse and saw Defendant's police car parked at the courthouse. Plaintiff also saw Mr. Monteiro parked alone in his vehicle in a "reserved" parking space near the court. Plaintiff and his wife then went inside and saw Defendant speaking to Ms. Monteiro in the doorway to one of the courtrooms. (See Plaintiff's Response to Interrogatory No. 7; pp. 62-67 of J. Costa dep.; and pp.76-81 of M. Costa's dep., attached as Exhibit E).

10. Plaintiff and his wife then proceeded to the restraining order counter and were told by the clerk that Defendant and Ms. Monteiro had attempted to vacate the restraining order, but that they were unsuccessful. (See pp. 66-67 of J. Costa dep.; and pp. 80-81 of M. Costa dep. of Exhibit E).

11. Defendant does not dispute that he went to the courthouse with Mrs. Monteiro. (See pp. 52-58 of Reul's dep., attached as Exhibit F).

12. Defendant also testified that, while he went to the courthouse with Mrs. Monteiro to "keep the peace," he left her there and did not confront Plaintiff or have any interactions with him when he saw him there. (See Exhibit F).

    c. Relationship with Monteiros

13. Defendant testified that he had never seen, known or had any kind of relationship with either Mr. or Mrs. Monteiro prior to serving them with a restraining order on July 16, 2002. (See pp. 38-39 of Reul's dep., attached as Exhibit G).

14. According to a neighbor who knows Mr. and Mrs. Monteiro and Defendant personally, Defendant is a personal friend of Mr. and Mrs. Monteiro. (See Affidavit of Bridgett Lopes, attached as Exhibit H).

   d. The Police Report

15. Plaintiff maintains that Defendant's police report in support of this arrest contains material misrepresentations of fact as to the alleged occurrence of a crime.

16. Plaintiff disputes that Defendant was "dispatched to headquarters to meet with complainant." (See pp. 17-18 of Reul's dep., attached as Exhibit I).

17. Plaintiff disputes that Mrs. Costa was "the complainant" referenced in his police report. (See Plaintiff's Response to Interrogatory 18; pp. 101-102 of J. Costa dep., attached as Exhibit J).

18. Defendant's police report falsely states that Mrs. Costa reported that Mr. Monteiro knocked on her window and said, "Your dead, bitch." Defendant did not take a statement from either Plaintiff or his wife, even though they waited at the station for almost one hour. (See pp. 87-93 of M. Costa dep., pp. 104-107 of J. Costa dep., attached as Exhibit K).

19. Plaintiff was at the police station at the time it is alleged in the report that he threatened Mr. Monteiro. (See pp. 99-100 of J. Costa's dep.; and Reul's police report, attached as Exhibit L).

20. Plaintiff has video surveillance film of the entire day of August 6, 2002. The videotape that shows him and his wife getting into their car and driving to the police station at approximately 1:39 P.M. (See pp. 93-94 of J. Costa dep., affidavit of John Costa and video time line, attached as Exhibit M).

21. The video footage shows Mrs. Monteiro handing a cordless telephone to Mr. Monteiro at approximately 2:08 P.M., and then Mr. Monteiro walking back into the house at 2:09 P.M.. (See affidavit of John Costa, and video time line of Exhibit M)

22. Plaintiff's surveillance film shows Mr. and Mrs. Monteiro leaving their house at 2:26 P.M.. (See affidavit of John Costa, and video time line of Exhibit M)

23. Defendant's police report has the following notations: "Occurred: 13:57"; "Received: 13:57"; "Arrived: 14:30." Defendant testified that his police report does not indicate when the offense occurred; when any of the parties arrived to the police station; and when the complaint was allegedly received by police officers. (See Reul's police report, of Exhibit 12; pp. 60-68 of Reul's dep., attached as Exhibit N).

24. Defendant's police report does not indicate that Plaintiff was at the police station when he was placed under arrest. (See Reul's police report of Exhibit L; and pp. 79-83 of Reul's dep., attached as Exhibit O).

25. According to standard police procedures, when a police officer responds to an allegation of domestic abuse, he should interview all the parties to properly "assess the situation." Plaintiff contends that Defendant did not interview him or his wife when they were at the police station. (See pp. 22-26 of Reul's dep, attached as Exhibit P).

26. Plaintiff contends that he was never confronted with Mr. Monteiro's allegations or even allowed to make a statement before being placed under arrest. (See Exhibits J & K).

27. Defendant did not include in his report whether Plaintiff gave a statement or declined to speak to police before he was placed under arrest, even though he would normally indicate such significant facts in any given report. (See pp. 87-88 of Reul's dep., attached as Exhibit Q).

28. Plaintiff contends that Defendant originally believed that Plaintiff had a restraining order against both Monteiros. (See p. 110 of J. Costa dep.; pp. 96-97 of Reul's dep., attached as Exhibit R).

29. Plaintiff contends that Defendant changed his report to reflect Mrs. Costa as the complainant once he discovered that Plaintiff did not have a restraining order against either of the Monteiros.[2] (See pp. 122-123 of J. Costa dep., attached as Exhibit S).

30. Defendant's report indicates that Mrs. Costa is the complainant, yet the "Witness Synopsis" reads, "Arnaldo violated *his* restraining order." Defendant

---

[2] The only way to justify the officer's arrest of Monteiro was to charge Monteiro with violation of a restraining order, which is an arrestable offense. G.L. c.209A, § 6. (Threats, a misdemeanor committed outside officer's presence is not an arrestable offense. G.L. 231, §94A). Since John did not have a restraining order against Monteiro and Mrs. Costa did, Mrs. Costa was replaced as the complainant.

6

has conceded that such a phrase does not make sense if the complainant was a female. (See pp. 97-99 of Reul's dep., attached as Exhibit T).

31. In fact, when pressed as to whether he originally reported that John was the complainant, Defendant replied, "I don't know." (See p. 97 of Exhibit T).

32. Plaintiff also maintains that Defendant did not submit a detailed written report in addition to the incident report, as required whenever an officer makes dual arrests for violations of a restraining order. (See pp. 15, 85 of Reul's dep., attached as Exhibit U).

   e. The Police Station

33. At approximately 1:55 PM, Plaintiff and his wife entered the police station and asked to speak with someone regarding a problem they were having with the Monteiros. They were told to sit down, and waited approximately 40-50 minutes. (See pp. 87-88 of M. Costa dep.; p. 104-105 of J. Costa dep., attached as Exhibit V).

34. While waiting, Plaintiff saw Mrs. Monteiro walk into an adjacent room, and he saw Mr. Monteiro park his car, waive at a police cruiser, and follow it to the back of the police station. (See p. 105 of J. Costa dep., attached as Exhibit W).

35. After 40 or 50 minutes, Defendant swung the door to the police desk open and flung his hands out and yelled, "What now?" Before Mrs. Costa could explain, he replied, "I am sick of this shit." (See pp. 89-90 of M. Costa dep.; p. 106 of J. Costa dep., attached as Exhibit X).

36. Approximately 10 minutes later, Defendant emerged again and told Plaintiff and his wife to wait in the car. About 10-15 minutes later, Defendant came out to

7

the car, grabbed Plaintiff by the arm and said, "Come with me." (See p. 107 of J. Costa dep., attached as Exhibit Y).

37. While walking back to the station, Defendant stated, "I am going to teach you for playing games with me . . ." (See Exhibit Y).

38. While sitting in the police station, Plaintiff is surprised to see Mr. Monteiro sitting across the room, looking bored, while Defendant was making jokes with the other officers. (See. p. 108 of J. Costa dep., attached as Exhibit Z).

39. Plaintiff was never told why he was being arrested. (See Exhibit Z).

## II.    STANDARD OF REVIEW

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) citing Fed.R.Civ.P. 56(c). Summary judgment is to be viewed in the light most flattering to the nonmoving and indulging all reasonable inferences in that party's favor. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994), citing *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989); *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989). The moving party bears the burden of showing "an absence of evidence to support the nonmoving party's case." *Maldonado-Denis*, 23 F.3d at 581. Here, Defendant cannot meet his burden of proof and this Court should deny his Motion for Summary Judgment.

## III.   ARGUMENT

1. **THE FEDERAL AND STATE CIVIL RIGHTS CLAIMS, THE FALSE IMPRISONMENT CLAIM AND THE MALICIOUS PROSECUTION CLAIMS SHOULD STAND BECAUSE THERE IS A MATERIAL DISPUTE OF FACT AS TO WHETHER THERE WAS PROBABLE CAUSE FOR THE ARREST AND WHETHER DEFENDANT ACTED WITH MALICE**

Defendant urges the Court to dismiss the state and federal civil rights claims, and the claims of false imprisonment and malicious prosecution. (Counts I, III, V and VI). Defendant essentially argues that if there was probable cause for the arrest then all of Plaintiff's claims must fail.  Defendant's argument fails for a number of reasons.

First of all, the question of "probable cause" is one of fact, to be determined by the jury.  *Lewis v. Kendrick*, 944 F.2d 949, 952 (1st Cir. 1991) citing *B.C.R. Transp. Co. v. Fontaine,* 727 F.2d (1st Cir. 1984); *Gutierrez v. M.B.T.A.,* 437 Mass. 396, 405 n.10 (2002); *New Bedford Hous. Auth. V. Olan*, 50 Mass. App. Ct. 188, 203 n. 26 (2000).  The court is only presented with a legal question when there are no disputes as to the predicate facts of the underlying legal proceeding. See *Crescent City Live Stock Co. v. Butchers' Union Slaughter-House Co.*, 120 U.S. 141, 149 (1887); *Stewart v. Sonneborn,* 98 U.S. 187, 194 (1879)("[p]robable cause is a mixed question of law and fact").

"Probable cause  … has come to mean more than bare suspicion: [it] exists where 'the *facts and circumstances* within their (the officers') knowledge and of which they had reasonably *trustworthy* information (are) sufficient in themselves to warrant a man of *reasonable caution* in the belief that' an offense has been or is being committed.'" *Brinegar v. United States*, 338 U.S. 160, 176 (1949) quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)(emphasis added).  As stated by the *Brinegar* Court:

> The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests [individual liberty versus law enforcement]. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Brinegar,* 338 U.S. at 176.

Thus, the standard of probable cause requires an assessment of the facts and circumstances present, then the application of the "reasonable person standard" to those facts. This determination should be left for the jury. *Lewis*, 944 F.2d at 952. This Court should refrain from making a ruling as a matter of law in this case where there remain unresolved material disputes surrounding the circumstances of the arrest.

Second, the arguable existence of probable cause does not necessarily shield an officer from civil liability. For example, in the context of malicious prosecution and abuse of process claims, courts have consistently held that such claims may prevail, despite the stated existence of probable cause. *Gutierrez,* 437 Mass. at 408. In such cases, the plaintiff can prevail so long as he can prove that the defendant knew "there was no probable cause for the prosecution and" that he "personally acted with an improper motive or he knew that [the other accusing party] was motivated by malice." *Beecy v. Pucciarelli*, 387 Mass. 589 (1982).

Probable cause does not validate an otherwise invalid search or arrest. See *Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984)(discussing Fourth Amendment); *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)(same). This is especially true in the case of warrantless searches and seizures, conducted outside the judicial process, which are "*per se* unreasonable [under both the Fourth Amendment and art. 14] – subject only to a few specifically established and well-delineated exceptions." *Commonwealth v. Anderson*, 406 Mass. 343, 346 (1989), quoting *United States v. Ross*, 456 U.S. 798, 825 (1982). Under the Massachusetts Declaration of Rights, when police officers conduct such warrantless searches, the burden is on the Commonwealth to justify the search or seizure. *Commonwealth v. Shields*, 402 Mass. 162, 164 (1988); *Commonwealth v. Antobenedetto*, 366 Mass. 51, 57 (1974).

Thus, probable cause is not a talisman that cures all Fourth Amendment violations.

Summary judgment is disfavored in cases where one party's state of mind is "crucial to the outcome." *Stepanischen v. Merchants Despatch Transp*. Corp., 722 F.2d 922, 928 (1st Cir. 1983)(where court noted in a discriminatory discharge case, a plaintiff "will rarely, if ever, be able to produce a 'smoking gun' that provides direct, subjective evidence of an employer's ... intent").  Plaintiff maintains that this was a wrongful arrest made in bad faith, and that Defendant manufactured "probable cause" as a pretext for an unlawful arrest.

There is ample record evidence to show that Defendant was acting out of malice when he arrested Plaintiff.  First of all, Defendant and the Monteiro's are friends.[3]  (See Exhibit H).  When Defendant served the restraining order on Mrs. Monteiro, he expressed how sorry he was to have to serve her. (Exhibit A).  Defendant explained how he could get the order vacated and have the Plaintiff arrested. (Exhibit A).  Defendant turned and shouted to Plaintiff to get back in his house; to stop listening to him or he will be arrested. (Exhibit C).  Plaintiff was so frightened he told his wife to dial "911" for assistance. (Exhibit D).  Defendant then accompanied Mrs. Monteiro -- the defendant in the restraining order -- to the courthouse to attempt to vacate the order he just served on her. This is the backdrop against which Plaintiff's claims of improper arrest should be viewed.

The record shows that on the day he was served with a restraining order, Plaintiff went to the police station to seek assistance, yet, incredibly, ended up being arrested. (Exhibits V & Y).  Defendant did not take a statement from Plaintiff, or allow him to confront the allegations against him. (Exhibits J & K).  Instead, he flung open the door and

---

[3] That Defendant has chosen to deny this fact creates another dispute of fact as to the important issue of his motivations for this unlawful arrest.

11

shouted, "What now?" (Exhibit X). Upon placing Plaintiff under arrest, Defendant grabbed him by the arm and stated, "I am going to teach you for playing games with me." (Exhibit Y). Viewing the evidence in the light most favorable to Plaintiff, Defendant's conduct did not meet the "reasonable person standard."

Indeed, Plaintiff's claims of unlawful arrest and prosecution are corroborated by objective evidence and the reasonable inferences to be drawn from them. The police report in support of this arrest, albeit rife with intentional misrepresentations of fact, actually corroborates material facts in support of Plaintiff's claim. [4]

According to the police report, while Mary Beth was making a complaint, "Arnaldo came in to make a complaint against Mary Beth's husband, John." (Reul's report of Exhibit L). Defendant's report fails to include the fact that Plaintiff, too, was at the station seeking assistance from the police, a fact that Defendant does not dispute. (Exhibit O). Plaintiff submits that his arrival at the police station to seek assistance is a significant fact that should be included in the police report so as to accurately reflect the circumstances under which he was accused of committing a crime. That Defendant omitted this important fact is material to Plaintiff's claim of malicious prosecution. See *Gutierrez,* 437 Mass. at 408 ("the jury could infer that the officers' reports intentionally exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges").

The top of the police report indicates the following notations: "OCCURRED: 13:57"; "RECEIVED: 13:57"; and "ARRIVED: 14:30." (Reul's report of Exhibit L). Defendant has taken the position that he does not know what these references mean, even though it is his report. (Exhibit N). Plaintiff takes the position that the terms, "occurred," "received" and "arrived" should be given their ordinary English interpretations.

---

[4] Plaintiff refers to ¶¶ 15-32 of "Facts in Dispute" *supra*.

Defendant's testimony that he does not know how to interpret his own report should be discounted completely, and viewed as consciousness of wrongdoing.

In any event, the police report corroborates Plaintiff's time line of events as demonstrated by his video surveillance film taken at his house. The video time line was constructed by Plaintiff, using 9:15 A.M. -- the time written down by the officer serving him with the restraining order after she checked her watch -- as the cue for the time of all the other images depicted on that day's video. (Exhibit M). According to the video timeline, Plaintiff and his wife can seen leaving their house at approximately 1:49 P.M. for the short ride to the police station, which is corroborated by the report, which indicates "ARRIVED" and "RECEIVED" at 13:57. (Reul's report of Exhibit L, and Exhibit M). Significantly, the video footage shows Mrs. Monteiro handing a cordless telephone to Mr. Monteiro at approximately 2:08 P.M., and then Mr. Monteiro walking quickly into the house at 2:09 P.M. (Exhibit M). The two can be seen leaving their house for the police station at 2:26 P.M. (Exhibit M). Again, the police report corroborates the video time line, since the report indicates, "ARRIVED: 14:30," six minutes after they left for the station. (Reul's report of Exhibit L).

That the Monteiros can be seen racing out of their house following a phone call that was placed to them (and while Plaintiff was at the station) supports Plaintiff's contention that the Monteiros were at the station because they were *called* to the police station; not because they decided to report a crime. Given Defendant's animus toward Plaintiff and his willingness to assist Mrs. Monteiro, one could reasonably conclude that Defendant intended to punish Plaintiff for making a complaint against the Monteiros. Viewing the objective evidence in conjunction with Plaintiff's testimony that he saw Monteiro *waive* at

13

the police officers and go to the back of the station (while his wife went to the front), Plaintiff has established a material dispute of fact as to whether "probable cause" for the arrest was manufactured by the Defendant to justify an unlawful arrest. (Exhibit W).

      Still other material disputes surround the circumstances of Plaintiff's arrest. One of the most significant disputes is whether Mrs. Costa made a complaint. Plaintiff and his wife categorically deny that she complained that Monteiro said, "Your dead, bitch," or otherwise made *any* statement to police (Exhibit K). As previously mentioned, the report was changed to reflect Mrs. Costa as the complainant so as to justify the arrest of Monteiro (which Defendant probably concluded was inevitable). (Exhibit S). Defendant's report indicates that Mrs. Costa is the complainant, yet the "Witness Synopsis" reads, "Arnaldo violated *his* restraining order." Defendant has conceded that such a phrase does not make sense if the complainant was a female. (Exhibit T). In fact, Defendant did not deny that he originally wrote the report to indicate Plaintiff as the complainant. (p. 97 of Exhibit T). The report intentionally misrepresents that Plaintiff's wife made a complaint, when she clearly did not.

      Finally, in determining probable cause for an arrest, an arresting officer may have a duty to pursue further information if it is available and likely to be trustworthy. *Palhava de Varella – Cid v. Boston Five Cents Sav. Bank*, 787 F.2d 676, 680 (1st Cir. 1986), citing *B.C.R. Transport Co. v. Fontaine*, 727 F.ed 7, 11 (1st Cir. 1984). Here, Plaintiff has consistently denied having been given the opportunity to speak to police, when that is precisely why he went to the police station in the first place. (Exhibits J & K). In fact, Defendant admits he did not even know why Plaintiff went to the police station. (Exhibit Q). Had Defendant even asked Plaintiff to respond to these allegations, Plaintiff would

14

have told Defendant about the video surveillance system he had that corroborated his claim of innocence.  He would have explained to the Defendant that he was there for assistance because he was afraid he might be arrested for the restraining order that was served on him hours earlier.  He would have tried to make peace.  Instead, Defendant chose to arrest Plaintiff based solely on the word of a man with a criminal record, who was alleged to have possessed firearms. (Exhibit C).

Defendant has essentially admitted that he did not follow department procedures in the handling of this case.  Defendant's department has a protocol for handling allegations of domestic assault that includes, among other things, interviewing all witnesses to adequately "assess the situation."  (Exhibit P).  Defendant is also did not submit a detailed written report in addition to the incident report, whenever an officer makes dual arrests for violations of a restraining order, as required by department protocol. (Exhibit U).  Thus, Defendant's handling of these alleged complaints does not even stand up to scrutiny under his department's usual protocol for handling cases of domestic assault.

Plaintiff has demonstrated with support from the record that the Defendant harbored animosity toward him and was biased in favor of the Monteiros.  The facts alleged by Plaintiff are sufficient to raise a dispute as to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The claims for civil rights violations, false imprisonment, and malicious prosecution are legally and factually sustainable.

   2. **THE DEFENDANT IS NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE IT WAS CLEARLY ESTABLISHED AT THE TIME OF THE ARREST THAT DEFENDANT'S CONDCUT WAS OBJECTIVELY UNREASONABLE**

"When a defendant moves for summary judgment on qualified immunity grounds, the court, 'must credit the plaintiff's version of defendant's actions to the extent that plaintiff has appropriately supported his version.'" *Sheehy v. Town of Plymouth*, 191 F.3d 15, 22 (1st Cir. 1999), quoting *Amsden v. Moran*, 904 F.2d 748, 752-53 (1st Cir. 1990). The facts alleged by the Plaintiff are sufficient to raise a dispute as to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Summary judgment is not warranted on the grounds of qualified immunity.

3. **PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE TO SUPPORT HIS STATE CIVIL RIGHTS CLAIM BY SHOWING THAT DEFENDANT INTERFERED WITH HIS CONSTITUTIONAL RIGHTS BY THREATS, INTIMIDATION AND COERCION**

Defendant next argues that Plaintiff has produced insufficient evidence to support a claim under the Massachusetts Civil Rights Action ("MCRA"). Plaintiff maintains that there is adequate legal and factual support for the state civil rights claim. Accordingly, Defendant's motion to dismiss this claim must fail.

As discussed above, Plaintiff's constitutional right to be free from unreasonable seizures was violated when he was arrested without probable cause. See Art. 14 of Declaration of Rights; Fourth Amendment to U.S. Const. The unlawful arrest implicates the constitutional violation. *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir. 1989).

Defendant also claims "there were no threats, intimidation or coercion within the meaning of the statute." This statement is incorrect. Both on the day he served the order and on the day of arrest, Defendant's language, demeanor and tone of voice was clearly intimidating and threatening. (Exhibit C & X). While placing Plaintiff under arrest, he grabbed his arm and stated, "I am going to teach you for playing games with me . . ."

(Exhibit Y). Clearly, Defendant had animosity toward Plaintiff that he exhibited with the full force of his power as a police officer. Defendant's conduct toward Plaintiff on the day of the arrest, in connection with his prior threats to have him arrested, are sufficient to support Plaintiff's claim for violations of the MCRA. *Planned Parenthood v. Blake*, 417 Mass. 467 (1994).

**4. PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIM OF FALSE IMPRISONMENT**

Plaintiff maintains that the reasons discussed *supra,* there is a material dispute of fact as to whether his false arrest constituted false imprisonment. Plaintiff's claim of false imprisonment must stand.

**5. PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIM OF MALICIOUS PROSECUTION**

Plaintiff maintains that the reasons discussed *supra,* there is a material dispute of fact as to whether his arrest was made in bad faith, and whether the police report in support of the arrest contained material misrepresentations and omissions of fact. Plaintiff's claim of malicious prosecution must also stand.

**IV.  CONCLUSION**

For all the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied as to all the remaining claims.

Respectfully Submitted,
JOHN V. COSTA,
By His Attorney,

/s/ Austin J. Freeley

Austin J. Freeley
BBO# 563349
221 Lewis Wharf
Boston, MA 02110
September 26, 2005                                                   (617) 723-9538